**Ex Parte Michael CROSS, Relator.**

No. 08–01–00209–CR.

Court of Appeals of Texas,
El Paso.

Feb. 21, 2002.

Michael R. Gibson, El Paso, for Relator.

Jaime E. Esparza, Dist. Atty., John L. Davis, Asst. Dist. Atty., El Paso, for State.

Before Panel No. 1: LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

In this appeal, relator Michael Cross ("Cross") seeks reversal of the trial court's denial of his application for a pretrial writ of habeas corpus. For those reasons detailed below, we dismiss the appeal for lack of subject matter jurisdiction because it is not yet ripe for adjudication.

### Facts

The facts of this case are undisputed and concern a series of events which led to Cross's arrest for criminal trespass at the Sunland Park Mall ("the Mall") in El Paso, Texas in April 2000. At that time, Cross was attempting to collect signatures at the Mall without its permission to put Pat Buchanan on the ballot for the 2000 presidential election. Cross has not denied he did not obtain permission from the Mall, nor that he was engaged in partisan political activity. Via a pretrial habeas application, he instead asserts that the criminal trespass statute, as applied to him, impermissibly infringes on his First Amendment right to free political speech.

Several employees of the Mall testified at the habeas hearing, including Sylvia Hernandez ("Hernandez"), the Mall's marketing director. She testified the Mall has a "common area" at its center. There are tables and chairs in the common area and people who use those facilities do not have to be customers of any commercial establishment in the Mall. Daily organ concerts are also given at the Mall and any member of the public can attend those concerts for free. Mall walkers are also allowed unrestricted use of the Mall when it is regularly open. Public access to the parking lots surrounding the Mall is equally unrestricted, although the Mall does not allow hand bills to be put on parked vehicles.

The Mall requires that anyone who wants to use the common area must first fill out a common area application ("the application"). The Mall's management then determines whether the application is approved and permission for the use granted. Hernandez testified that in the past, the Elections Bureau had set up voting booths for early voting at the Mall. The public has always been given free access to the voting booths.

In general, the Mall does permit non-commercial, promotional, and community service activities in the common area. Other activities to which the public has free access include children's concerts and health fairs. However, those groups must still fill out the application and receive permission before such performances or events can be held.

Final decisions concerning common area applications are made by the Mall manager. The application contains a general release and indemnity provision and details thirteen rules and regulations which ap-

proved applicants must follow. For example, common area users must conduct their activities within the time frame allowed by the Mall. Their activities must also not offend customers or impede business conducted in the Mall. Under its own policies, the Mall retains complete discretion in making common area use decisions.

The Mall has turned down some common area applicants in the past, including a request by the local Jaycees to collect signatures for a petition concerning a bond issue. The Mall does not like to create the perception that it as a corporate entity is taking a stance on partisan political issues. For these reasons, it refuses all applications that involve any partisan political activity.

The Mall also retains booth space for lease to non-commercial community groups such as U.S. Marines, El Paso Police Department, and U.S. Border Patrol recruiters. Although these entities pay the Mall rent for that space, they must still file an application and receive Mall approval.

Sometime in late April 2000, Hernandez and Mall manager Connie Warner ("Warner") met with Cross and several associates at the Mall office. Cross came to the Mall office after an initial attempt to gather signatures on a petition to have Pat Buchanan's name placed on the 2000 presidential ballot. Hernandez told the group they would have to fill out an application as the first step to receiving permission to conduct activities in the Mall. Hernandez understood the men wished to collect signatures for Pat Buchanan. She also believed that she knew at the time that she asked them to fill out an application it would not be granted because it involved partisan political activity. She nevertheless felt she had to offer them the opportunity to apply.

Warner testified that when she spoke with Cross he refused to fill in an application, that he wanted several locations in the Mall, and that when he was told that at most he might only be allowed one, he left Warner's office. Warner testified that had she received an application, she would have denied it.

A few days after this initial meeting, Hernandez was on her way into the Mall when she observed Cross standing outside the Mall at the main entrance with a clipboard. She also saw Cross approach someone who had walked through the doors of the Mall. After that person walked away, Hernandez approached Cross and asked him what he was doing. He told her he was gathering signatures to have Buchanan placed on the ballot.

Hernandez recognized Cross from their meeting in the Mall office and asked him whether he had filled out an application. Hernandez also asked Cross if someone at the Mall had given him oral permission to collect the signatures. He replied that he did not need permission to gather signatures. Hernandez told him that since he did not have permission from the Mall he would have to leave.

Hernandez then called Warner and let her know what was happening. Warner instructed Hernandez to call security and to tell Cross that he had to leave or the police would be called. Hernandez took a member of the Mall's security force with her to talk to Cross again. By this time, two other men were assisting Cross in gathering signatures. Hernandez again asked Cross to leave, he again refused, and she called the police. Ultimately the police arrested Cross.

Hernandez testified that the main purpose of the Mall is to make money and that those non-commercial, community activities which the Mall does authorize increase traffic flow and promote good community relationships. Voting booths

increase traffic flow and the potential that people will shop after they have voted. The voting booths do not impede traffic and are purely voluntary on the part of any person using them in the Mall. Warner testified that Cross was impeding traffic and disturbing people in the Mall. Some people who Cross approached were offended and reported that to the Mall office.

Sergeant Harry Farlow ("Farlow") of the El Paso Police Department testified he had been involved in a similar incident with Cross at a local Target store about two weeks prior to the Mall incident. Cross had agreed to leave the Target premises and was therefore not arrested at that time.

When Farlow arrived at the Mall after being called by Mall personnel, he found Cross directly inside one of the main entrances to the Mall talking to other police officers. Cross had already refused to leave the Mall and asserted that he was going to continue with his activity. Farlow spoke with Mall personnel who agreed they were willing to prosecute if Cross refused to leave. After giving Cross another chance to leave, and after Cross's refusal to do so, Farlow arrested Cross and two others for criminal trespass. Cross was escorted out of the Mall, cuffed, transported to the police station and, from there, to jail for booking.

Cross has been free on bond since before the time of arrest. On August 9, 2000, Cross filed an Application For Issuance Of a Writ Of Habeas Corpus alleging that he was being illegally confined and restrained because the criminal trespass statute was being unconstitutionally applied in his case. In essence then the habeas petition sought a pretrial dismissal of the criminal trespass charge against Cross, although the indictment itself was not challenged.

After holding an extensive evidentiary hearing on the matter, the trial court denied Cross's application holding that the criminal trespass statute was not being applied in an unconstitutional manner. The trial court entered an order refusing the application on April 12, 2001. Cross timely appealed to this Court.

## Subject matter jurisdiction

■ No party to this appeal has addressed whether the trial court or this Court had subject matter jurisdiction over this appeal. Nevertheless, subject matter jurisdiction cannot be conferred on any court by the parties agreement and is always a question of law subject to *sua sponte* review by this Court. *Russ Berrie and Co., Inc. v. Gantt,* 998 S.W.2d 713, 715 (Tex.App.-El Paso 1999, no pet.).

■ This Court may, in certain circumstances, retain appellate jurisdiction to hear an appeal from a trial court's denial of a pretrial writ of habeas corpus. *Ex parte Hargett,* 819 S.W.2d 866, 869 (Tex. Crim.App.1991); *Denby v. State,* 627 S.W.2d 435 (Tex.App.-Houston [1st Dist.] 1981, no pet.), *cert. denied,* 462 U.S. 1110, 103 S.Ct. 2461, 77 L.Ed.2d 1338 (1983). This Court also retains the discretion to refuse to hear appeals concerning the denial of a pretrial habeas application. *Ex parte Weise,* 55 S.W.3d 617, 619 (Tex.Crim. App.2001). Whether we should dismiss this appeal for lack of subject matter jurisdiction or retain jurisdiction and potentially reach the merits as an exercise of our discretion is at issue in this case.

Although not dispositive, the Court of Criminal Appeals recent *Weise* case provides some guidance. In that case, the court retained jurisdiction over a pretrial habeas "as applied" challenge. *Weise,* 55 S.W.3d at 619–21. However, the *Weise* court also declined to exercise its discre-

tion to reach the merits of the appeal and reversed the court of appeals's merits decision by holding that pretrial habeas relief was inappropriate because the defendant had an adequate remedy at law to vindicate his rights. *Weise,* 55 S.W.3d at 621. As a corollary to that holding, the *Weise* court stated that the issue raised by Weise's pretrial habeas—whether the illegal dumping statute required a culpable mental state and was thus being applied against him in an unconstitutional manner—was "not yet ripe for review." *Id.; see Ex parte Tamez,* 4 S.W.3d 366, 367 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (accepting jurisdiction but declining to rule because issue raised in pretrial habeas is not ripe for review).

■ Ripeness, however, presents a threshold issue that implicates the court's subject matter jurisdiction, not its discretionary authority. *See Patterson v. Planned Parenthood,* 971 S.W.2d 439, 442 (Tex.1998); *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998).

The *Weise* and the *Tamez* decisions thus muddy the important distinction between an appellate court's authority to hear an appeal, subject matter jurisdiction, and an appellate court's discretionary power to refuse to hear an appeal.

■ The ripeness doctrine examines the timing of a lawsuit and its factual posture at the time of its filing. *Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851–52 (Tex.2000); *see also Patterson,* 971 S.W.2d at 442. It also allows courts to avoid premature adjudication and serves constitutional interests in prohibiting advisory opinions. *Patterson,* 971 S.W.2d at 442; *Gibson,* 22 S.W.3d at 852. The theory behind the doctrine is straightforward—if the plaintiff's injury is not concrete and depends on contingent, remote, or hypothetical facts, the court does not

have jurisdiction to hear the dispute. *Gibson,* 22 S.W.3d at 852.

■ The appellate court must look to the facts and evidence existing when the suit was filed to determine whether the asserted claims are ripe. *Gibson,* 22 S.W.3d at 851–52. It is undisputed that Cross is on bond. It is undisputed that Cross, like the defendant in *Weise,* "is not claiming [the] statute itself is unconstitutional .... [or] that the trial court lacked the power to proceed." *Weise,* 55 S.W.3d at 620–21.

Cross's sole claim here is that the statute is unconstitutional only as applied to him. *See Weise,* 55 S.W.3d at 617, 621 (pretrial habeas relief only appropriate when facial challenge to constitutionality of statute made). However, the charge against Cross had not yet been adjudicated. *See Tamez,* 4 S.W.3d at 368 (as applied challenge to constitutionality of perjury statutes not ripe for adjudication when defendant had not yet been tried but claimed that unconstitutional harm was that trial court would be unable to issue fair jury instruction); *Clements v. Fashing,* 457 U.S. 957, 972 n. 6, 102 S.Ct. 2836, 2848 n. 6, 73 L.Ed.2d 508 (1982) (First Amendment rights do not suffer when constitutionality of statute being litigated on a case by case basis). Any injury that Cross might suffer is therefore still sufficiently contingent or remote such that the issue before us is not ripe for adjudication. *Gibson,* 22 S.W.3d at 851–52; *see also Patterson,* 971 S.W.2d at 442.

■ We are aware that the ripeness doctrine must be applied with extra care with regard to First Amendment challenges to prevent any chilling effect on the free exercise of the right to free political speech. *See Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984). However, by defini-

tion, the only chilling effect in this case is as to Cross precisely because this is an as applied challenge and does not involve a prior restraint. *See Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 434 (Tex.1998) (Texas Constitution only creates a higher standard than federal First Amendment when prior restraints in the form of court orders prohibiting or restricting speech involved); *Citizens Ass'n For Sound Energy v. Boltz,* 886 S.W.2d 283, 293 (Tex.App.-Amarillo 1994, writ denied), *cert. denied,* 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995) (citing *Clements v. Fashing,* 457 U.S. 957, 972 n. 6, 102 S.Ct. 2836, 2848 n. 6, 73 L.Ed.2d 508 (1982)) (traditional standing and ripeness requirements not waived where facial constitutionality of statute not challenged, nor when First Amendment rights are litigated on a case by case basis). Stated another way, Cross does not allege the statute is overbroad, vague, or otherwise constitutionally infirm to implicate any chilling effect on other persons unknown. *See Joseph H. Munson Co.,* 467 U.S. at 956, 104 S.Ct. at 2847 (facial challenge to statute implicates First Amendment chilling effect concerns and calls for loosened application of ripeness doctrine); *Weise,* 55 S.W.3d at 620; *see, e.g., Bader v. State,* 15 S.W.3d 599, 603–06 (Tex.App.-Austin 2000, pet. ref'd); *Ex parte Anderson,* 902 S.W.2d 695, 698–701 (Tex.App.-Austin 1995, pet. ref'd) (overbreadth challenges usually reserved for First Amendment violations); *Reed v. State,* 762 S.W.2d 640, 643–46 (Tex.App.-Texarkana 1988, pet. ref'd) (direct appeal rejecting First Amendment challenge to criminal trespass statute and sustaining conviction).

We presently interpret the gravamen of Cross's merits argument to be that the Mall has become the functional equivalent of the town square such that his First Amendment right to free political speech is protected on otherwise private property. In both his briefing and at oral argument, Cross attempted to support this conclusion by arguing that sociological changes to the nature of public space in American society have occurred. However there was no testimonial or documentary evidence to substantiate this contention. Whether such evidence will be adduced during the trial on the merits is of course up to the parties but its present absence further reinforces our conclusion that this case is not ripe for adjudication.

The Court of Criminal Appeals has consistently cautioned against most use of pretrial writs to adjudicate "as applied" constitutional challenges; this also mitigates against the exercise of our discretion. *See Weise,* 55 S.W.3d at 620 (pretrial habeas only appropriate when facial challenge to constitutionality of statute made). On this record, we are not prepared to expand Texas jurisprudence to hold that a pretrial writ of habeas corpus is the appropriate procedural vehicle by which an as applied First Amendment challenge should be adjudicated. This conclusion is particularly reinforced by settled Texas law that an "as applied," as opposed to a facial, constitutional challenge can only be preserved by raising that challenge in the trial court. *See Bader,* 15 S.W.3d at 603. In other words, Texas law contemplates that such challenges can be adjudicated on direct appeal. *See Reed,* 762 S.W.2d at 643–46.

### Conclusion

We therefore dismiss this attempted appeal for lack of subject matter jurisdiction because it is not yet ripe for review.